1

2

3

4

5          UNITED STATES DISTRICT COURT

6          NORTHERN DISTRICT OF CALIFORNIA

7

8    LARRY GENE SMITH,                          No. C-06-2972 EMC

9              Petitioner,

10        v.                                      **ORDER DENYING PETITIONER'S**
                                                 **PETITION FOR A WRIT OF HABEAS**
11   ROSANNE CAMPBELL, *et al.*,                  **CORPUS**

12             Respondent.                        **(Docket No. 1)**

13   _____/

14

15        Petitioner Larry Gene Smith filed this petition for a writ of habeas corpus.  Docket No. 1

16   ("Petition").  Petitioner presents two grounds for relief: (1) Petitioner's trial counsel rendered

17   ineffective assistance of counsel, and (2) the prosecutor committed pervasive misconduct during her

18   cross-examination of Petitioner and closing arguments.  Petition at 1, 10.  For the reasons stated

19   below, the Court **DENIES** Petitioner's petition for habeas relief.

20                      I.    **FACTUAL & PROCEDURAL HISTORY**

21        Petitioner was convicted of second degree murder, use of a firearm, and infliction of great

22   bodily injury after the shooting of Russell Tom, and was sentenced to an aggregate term of 40 years

23   to life.  2 Clerk's Transcript ("CT") 515-516, 654; 17 Reporter's Transcript ("RT") 2829-2831.  The

24   following facts are taken from the California Court of Appeal Opinion.[1]

25   _____

26        [1] Petitioner argues that the Court of Appeal's decision is not a factual decision constituting a
     factual finding that is presumed correct under the Antiterrorism and Effective Death Penalty Act
27   ("AEDPA"), 28 U.S.C. § 2254.  Docket No. 55 at 4 ("Traverse").  The Ninth Circuit has found that
     "[b]ecause this initial statement of facts is drawn from the state appellate decision, it is afforded a
28   presumption of correctness that may be rebutted only by clear and convincing evidence."  *Moses v.
     Payne*, 555 f.3d 742, 747 n.1 (9th Cir. 2009); *see also Slovik v. Yates*, 556 f.3d 747, 749 n.1 (9th Cir.

United States District Court

For the Northern District of California

Defendant was sitting in Baggy's, an Oakland bar, when he spotted a longtime acquaintance, Russell Tom. Defendant called to Tom, and the two began drinking and talking together. After over an hour of conversation, the pair left the bar, and a physical confrontation ensued. Tom subsequently reentered the bar, but defendant, whose face was bleeding badly, was turned away by the bar's owner. Defendant drove home to clean up.

Defendant returned to the bar, but he was again turned away by the bar owner and retreated to his car. Tom eventually left the bar. Defendant was seen standing with his hands on the roof of Tom's car, speaking through the driver's side window. Very shortly thereafter, defendant fired several shots at Tom, got into his car, and sped off. Tom was found lying in the middle of the street, about 20 to 24 feet from his car, having been shot twice in the chest, once in the arm, and once in the back. He died from the wounds. Defendant was arrested the next day.

Testifying in his own defense, defendant explained that the shooting had occurred in self-defense. According to defendant's testimony, he was carrying at least $500 in cash when he went to the bar that night. During his conversation with Tom in the bar, Tom talked of his financial difficulties and, seeing defendant's cash, repeatedly pressed him for financial help. The first physical confrontation occurred after defendant refused to provide such help and, in frustration at Tom's repeated requests, stood up and left the bar. Outside the bar, Tom surprised defendant from behind, striking defendant in the back and continuing to hit him as he fell. When defendant shouted at Tom, he stopped and apologized. As the two tried to reenter the bar together, the bar owner refused to allow defendant back into the bar. Defendant decided to go home to clean up, and Tom and defendant agreed as he left that they would discuss the matter further when defendant returned to the bar.

Defendant testified that when he returned to the bar, he parked in front and was met by the bar owner, who again refused defendant admittance because, the owner said, he feared a "gunfight." The owner said he would tell Tom that defendant had returned. Defendant got back in his car, drove around the block, and parked up the street to wait for Tom. A longtime welfare fraud inspector, now retired, defendant had acquired the habit of keeping a loaded handgun in the glove compartment of his car. Recalling the bar owner's unprovoked comment about a "gunfight," defendant became concerned that the bar owner had given Tom a gun. Defendant retrieved his gun and put it in his waistband. When Tom emerged from the bar, defendant approached him, and they talked as Tom walked to and entered his

2009) ("[T]he recitation of the facts is drawn from the finding of fact in the opinion of the California Court of Appeal, whose findings are presumed correct unless rebutted by clear and convincing evidence."); *Vasquez v. Kirkland*, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

Petitioner argues that the Court of Appeal's statement of facts contains "significant errors and omissions." Traverse at 4-6. While several of these omissions were already identified in the Court of Appeal's statement of facts, the Court will identify inconsistencies raised by Petitioner.

United States District Court

For the Northern District of California

car.[2]  During the conversation, Tom again pressed defendant for help.[3]
Defendant refused the $200 Tom was seeking but handed him $40
through the car window and began to walk away.  When defendant
heard a "loud explosion," he turned to find that the window of Tom's
car has been shattered and Tom was getting out, apparently enraged.
As Tom advanced on defendant, defendant drew his gun and fired a
warning shot, either into the air or behind himself.  When Tom
reached into his clothing and drew out a "black, shiny object,"
defendant began shooting him. After the shooting, defendant drove to
an estuary, where he became disgusted and nauseous at the thought of
the shooting and threw away his gun.

The testimony of the prosecution's witnesses conflicted in some
respects with defendant's testimony. The bar's owner testified that
there had long been "bad blood" between defendant and Tom. On the
night in question, both the bar owner and the bartender on duty heard
defendant loudly refer to Tom as "Navajo," a term the bartender
viewed as insulting to Tom, a Native American. The bar owner, who
saw some of the initial confrontation, testified that defendant and Tom
left the bar at the same time and argued in the parking lot for a time
before fighting. Tom returned to the bar first, sporting an apparent cut
lip. Tom told the bar owner that defendant had "started" the fight. The
bar owner further testified that the first time he turned away defendant
from the door of the bar, defendant said that "he's going to go home
and get a gun and shoot the son of a bitch."  When defendant returned
to the bar, the owner sent him away from fear of this earlier threat.  At
the time, defendant lifted his shirt to show the bar owner that he was
not carrying a gun.  Although there were no witnesses to the shooting,
an off-duty police officer who was emerging from the bar just as the
shooting stopped saw defendant standing over Tom, who was lying in
the street.[4]  Defendant's arm was extended downward toward Tom,
pointing a gun.  Defendant immediately walked to his car and sped off.

Certain aspects of the physical evidence were also at odds with
defendant's testimony.  There were no injuries to Tom's hands, as
would have been expected had he punched out his car window.  A
good portion of the glass from the broken window of Tom's car was
inside the vehicle, "big parts" of it on the driver's seat, also
inconsistent with defendant's account of the breaking of the window.
Defendant had fired a total of six shots, four of which hit their mark.
Although most of the bullet casings were found near the rear end of
Tom's car, the sixth was very close to Tom's body as it lay on the
ground.  The only "black, shiny object" in Tom's immediate
possession was the case for his reading glasses, which he wore only
when reading.  Finally, a stray bullet was found to have recently

---

[2]  Tom's toxicology record reflected that Tom's blood-alcohol level ("BAL") was .27% at
the time of his death, 3.5 times the legal limit.  6 RT 1139-40.

[3]  The witness who saw Petitioner standing with his hands on the roof of Tom's car also
testified that the conversation between Petitioner and Tom appeared to be cordial.  6 RT 475.

[4]  The officer testified that he had heard a shot, a pause, and then a rapid series of four shots.
3 RT 504.

**United States District Court**
For the Northern District of California

shattered a window in a vehicle parked approximately two blocks away.[1]  If this was the "warning shot" fired by defendant, he would have had to fire the warning shot on parallel to the ground, directly behind himself.

> FN1. When the police investigated the night of the shooting, the window was still audibly "crackling," indicating that it had been broken recently.

*People v. Smith*, A100109, 2004 Cal. App. Unpub. LEXIS 10325, at *2-8 (Cal. Ct. App. Nov. 12, 2004).  Following Petitioner's conviction, he was sentenced to an aggregate term of 40 years to life.

Petitioner timely appealed his conviction to the California Court of Appeal, which affirmed his conviction.  Exh. C.  His petition for review to the California Supreme Court was denied without discussion.  Petitioner then filed this petition for a writ of habeas corpus in 2006, presenting four claims: (1) ineffective assistance of counsel, (2) prosecutorial misconduct, (3) improper impeachment of Petitioner's credibility in violation of *Doyle v. Ohio*, and (4), exclusion of evidence that Tom owed money to the Franchise Tax Board.  Petition, Attachment A.  Judge Patel granted a stay and abeyance of the proceedings until Petitioner exhausted his state remedies.  Docket No. 17 at 1.  After the California Supreme Court denied Petitioner habeas relief in a one-sentence summary order, the Court reopened Petitioner's federal petition for further consideration.  Exh. I, Docket No. 17 at 1.

Judge Patel issued an order to show cause on Petitioner's ineffective assistance of counsel, prosecutorial misconduct, and *Doyle* claims, but not for the exclusion of the Franchise Tax Board evidence claim.  Docket No. 17 at 3-5.  In the State's Answer, Respondent moved to dismiss much of Petitioner's second claim of prosecutorial misconduct under California's contemporaneous objection rule.  Docket No. 18-1 at 28 ("State's Answer").  After the parties separately briefed the applicability of procedural default, Judge Patel ruled that California's contemporaneous objection rule was not an adequate procedural bar that prevented the Court from reviewing the merits of Petitioner's prosecutorial misconduct claim.  Docket No. 50 at 9.  Following Judge Patel's ruling, Petitioner filed his traverse, in which he conceded that he could not establish his *Doyle* claim.  Accordingly, the Court's review is limited to Petitioner's ineffective assistance of counsel and prosecutorial misconduct claims.

**United States District Court**
For the Northern District of California

## II.   DISCUSSION

A.      Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal habeas corpus relief is available to state prisoners who are "in custody in violation of the Constitution or laws or treaties of the United states."  28 U.S.C. § 2254(a).  The AEDPA places new restrictions on federal habeas review by requiring that the court give considerable deference to state court decisions.  *Hines v. Thompson*, 336 F.3d 848, 852 (9th Cir. 2003).  Thus, the court may not normally grant a writ of habeas corpus unless:

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United states; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Similarly, "under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The state court's application must be more than incorrect or erroneous, but must be objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

When deferring to the state court's decision, this Court reviews "the state court's last reasoned decision."  *Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991).  If the state supreme court denies the habeas petition without comment, the Court looks to the lower state court's decision. *E.g.*, *Maxwell*, 606 F.3d at

**United States District Court**
For the Northern District of California

568 ("Here, because the California Supreme Court denied direct review and Maxwell's subsequent habeas petitions without comment, we review the California Court of Appeal's unpublished opinion.").  Where the state court reaches a decision on the merits but there is no reasoned decision, the Court independently reviews the record to determine if the state court clearly erred.  *See Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011).  Although the Court independently reviews the record, the Court must still defer to the state court's ultimate decision.  *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).  Accordingly, the petitioner has the burden of showing that there was no reasonable basis for the state court to deny relief.  *Stanley*, 633 F.3d at 860 (citing *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011)).

Section 2254(d) applies where a claim is adjudicated on their merits in the state court proceedings.  *Cf. James v. Ryan*, No. 08-99016, 2012 U.S. App. LEXIS 4100, at *50 (9th Cir. Feb. 29, 2012).  The state court is not required to state that it is adjudicating a claim on the merits; "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington*, 131 S. Ct. at 784-85.  "Where a state court does not reach the merits of a federal claim, but instead relies on a procedural bar later held inadequate to foreclose federal habeas review, [the Court] review[s] *de novo*."  *James*, 2012 U.S. App. LEXIS 4100, at *50; *Pirtle*, 313 F.3d at 1167.

In the instant case, the Court will review Petitioner's ineffective assistance of counsel claim by independently reviewing the record to determine if the California Supreme Court had any reasonable basis to deny the claim.  Petitioner presented his ineffective assistance of counsel claim in his habeas petition to the California Supreme Court.  Exh. G.  The California Supreme Court denied the petition in a one-sentence summary order, and the Court must assume that the California Supreme Court adjudicated Petitioner's ineffective assistance of counsel claim on the merits.  *See* Exh. I; *Harrington*, 131 S. Ct. at 784-85 (holding that the California Supreme Court's one-sentence summary order denying habeas relief was an adjudication on the merits).  However, because the California Supreme Court did not explain its denial of Petitioner's ineffective assistance of counsel

United States District Court

For the Northern District of California

1  claim and there is no last reasoned decision,[5] the Court independently reviews the record to

2  determine whether the state court unreasonably applied federal law to this claim. *See Samayoa v.*

3  *Ayers*, 649 F.3d 919, 928 (9th Cir. 2011) ("Because the California Supreme Court denied the

4  ineffective assistance of counsel claim without explanation, we independently review the record to

5  determine whether the state court unreasonably applied *Strickland*.").

6        With respect to Petitioner's prosecutorial misconduct claims, two standards of review will

7  apply. Unlike Petitioner's ineffective assistance of counsel claim, prosecutorial misconduct claim

8  was previously presented to the Court of Appeal on appeal. Exh. C. The Court must therefore look

9  through the California Supreme Court's denial to this last reasoned decision – the Court of Appeal's

10  decision. *See Maxwell*, 606 F.3d at 568. On appeal, the Court of Appeal reviewed only two of

11  Petitioner's sub-claims[6] on the merits, and applied the contemporaneous objection rule to bar

12  consideration of all or significant portions of the remaining sub-claims. Docket No. 55 at 10

13  ("Traverse"). Judge Patel subsequently ruled that the contemporaneous objection rule was not an

14  adequate procedural bar preventing the Court from reviewing the prosecutorial misconduct

15  subclaims on the merits. Docket No. 50 at 9. Accordingly, the Court will apply § 2254(d)'s

16  deferential standard where the Court of Appeal reviewed the challenged conduct. Where the Court

17  of Appeal did not reach the merits of the alleged misconduct, the Court will review the challenged

18  conduct *de novo*. *Compare with James*, 2012 U.S. App. LEXIS 4100, at *55 (reviewing the

19  petitioner's claim *de novo* where the state court relied on an inadequate procedural bar to dismiss the

20  claim).

21  B.    <u>Ineffective Assistance of Counsel</u>

22        As an initial matter, the Court independently reviews the record to determine if the California

23  Supreme Court unreasonably applied federal law in rejecting Petitioner's ineffective assistance of

---

24

25      [5] Petitioner did not present his ineffective assistance of counsel claim in his direct appeal to the Court of Appeal. Exh. D. Accordingly, the Court of Appeal's decision did not rule on the

26  ineffective assistance of counsel claim.

27      [6] The two sub-claims adjudicated on the merits are: (1) the prosecutor's questions asking Petitioner to speculate about the level of alcohol in his blood at the time of the shooting, and (2) the prosecutor's references to the killing as a "murder" during examination and on two exhibits. *Smith*,

28  2004 Cal. appl. Unpub. LEXIS 10325, at *16-20, 40-41.

United States District Court

For the Northern District of California

counsel claims.  The Sixth Amendment guarantees effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id.*  To prevail on an ineffective assistance of counsel claim, the petitioner must establish that: (1) counsel's performance was deficient, such that counsel's representation fell below an objective standard of reasonableness, and (2) the petitioner was prejudiced by his counsel's deficient performance.  *Id.* at 687-88.  Prejudice occurs where the petitioner "show[s] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

The *Strickland* standard is highly deferential, and when combined with § 2254(d)'s highly deferential standard, "review is 'doubly so.'"  *Harrington*, 131 S. Ct. at 788.  Where § 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Id.* Accordingly, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."  *Id.* at 785.

       1.      <u>Failure to Investigate and Present Expert Testimony on Wounds Ballistics</u>

Petitioner argues that trial counsel rendered ineffective assistance of counsel when trial counsel failed to investigate and present expert testimony regarding "reaction-response" times.  Petition at 7; Traverse at 11.  At trial, the prosecutor argued that Petitioner did not act in self-defense because he shot Tom in the back.  Trial counsel presented no evidence in rebuttal, and Petitioner contends that expert testimony regarding "reaction-response" times that could have demonstrated that Petitioner did not intentionally shoot Tom in the back.  Petition at 7; Traverse at 11.

In the Tobin & Fackler study, the time needed to turn the human torso was compared with the time needed to react to a stimulus and fire a handgun.  Docket No. 60 ("Tobin & Fackler Study").  The study was conducted by asking two volunteers to make 180 degree turns of their torsos as quickly as possible.  Tobin & Fackler Study at 1.  A total of five 180 degree turns were timed.  The study also timed forty-six officers' "reaction-response times," or the time for the officer

United States District Court

For the Northern District of California

1    to fire a handgun in response to a stimulus.  Tobin & Fackler Study at 1, 2.  After comparing the

2    reaction-response times to the time it took for volunteers to turn, the study concluded that a person

3    "can turn their torso and end up facing away from a shooter by the time the gun is fired even though

4    they were facing the gun at the time the shooter decided to fire."  Tobin & Fackler Study at 1.

5            As part of his petition, Petitioner submitted the declaration of Alexander Jason, a board-

6    certified senior crime scene analyst who specializes in shooting incident analysis and reconstruction.

7    Docket No. 59 ¶ 1 ("Jason Decl.").  Jason reviewed the trial record, autopsy photos, crime scene

8    photos and diagrams, and police and evidence reports.  Jason Decl. ¶ 5.  Jason found that these

9    materials were consistent with Petitioner's account of the shooting, *i.e.* Tom did not have his back to

10   Petitioner when Petitioner fired the shot which entered Tom's lower right back.  Jason Decl. ¶ 6.

11   Instead, Jason opined that after Tom was shot the first time, he turned to run away and was shot in

12   the back while completing his rotation.[7]  Jason Decl. ¶ 12.

13           a.    Deficient Performance

14           Petitioner has not established that his trial counsel's performance was deficient.  A defense

15   attorney has a duty to make reasonable investigations or make a reasonable decision that a particular

16   investigation is unnecessary.  *See Strickland*, 466 U.S. at 691; *Cullen v. Pinholster*, 131 S. Ct. 1388,

17   1407 (2011).  "*Strickland* directs that 'in any ineffectiveness case, a particular decision not to

18   investigate must be directly assessed for reasonableness in all circumstances, applying a heavy

19   measure of deference to counsel's judgments.  *Silva v. Woodford*, 279 F.3d 825, 936 (9th Cir. 2002)

20   (quoting *Strickland*, 466 U.S. at 491).  Thus, "[t]he critical issue is whether, applying prevailing

21   professional norms, trial counsel conducted an objectively reasonable investigation for mitigating

22   evidence."  *Samayoa*, 649 F.3d at 928.  In the instant case, Petitioner's trial counsel has stated that

23   the reaction-response time evidence could have negated the prosecutor's argument that the shot in

24   Tom's back demonstrated malice, and that his "failure to investigate and present this type of expert

25   evidence was not the result of a tactical error."  Docket No. 58 ¶ 7 ("Cooper Decl.").  However, the

26   _____

27          [7]  Jason theorized that (1) the first shot entered Tom's body in the right upper mid-chest; (2)
     the second shot entered Tom's right upper arm and exited the other side of his arm, and then re-
28   entered Tom's lest chest and exited at the outer aspect of his left nipple; and (3) the third shot
     entered Tom's lower right back and exited the upper abdomen.  Jason Decl. ¶ 9.

United States District Court

For the Northern District of California

Court finds that Petitioner has not demonstrated deficient performance because the Tobin & Fackler study had limited applicability to Petitioner's case.

First, the circumstances of the study and the actual shooting are readily distinguishable, raising doubts that Tom could have turned as quickly as the Tobin & Fackler volunteers.  In the study, the two volunteers were active, well-proportioned males who were instructed to turn their torsos 180 degrees as quickly as possible.  Tobin & Fackler Study at 1-2.  The study did not look at the effect of extraneous factors, such as intoxication, active movement, or injury.  In contrast to the Tobin & Fackler volunteers, Tom was intoxicated – with a BAL of .27% at the time of his death, 3.5 times the legal limit – and charging at Petitioner at "full speed."  *See* 6 RT 1139-40; 11 RT 1810-11; 12 RT 1887, 1893; 16 RT 2499.  Furthermore, Jason theorized that Tom was shot in the chest before he started to turn, and shot through the arm and side while turning.  Jason Decl. ¶ 12.  While Jason states that Tom's intoxication or active movement would not necessarily affect Tom's ability to turn quickly, Jason did not address the effect of the combination of these two factors or a severe wound on a person's ability to turn.  *See* Jason Decl. ¶¶ 15, 18.  Based on these distinctions, the California Supreme Court could reasonably have found that the combination of Tom's intoxication, his charging forward, and his severe injuries would have prevented Tom from turning as quickly as required for the Tobin & Fackler study to apply.

Second, there was no evidence that Tom tried to turn during the shooting.  Petitioner never testified that Tom tried to turn and run away during the shooting.  Petitioner's description of the shooting was key to his self-defense argument, and if Tom had turned around, this information would likely have come out during Petitioner's description of the shooting even in the absence of any reaction-response evidence.  Petitioner did not so testify, further signaling that the study was not applicable or entitled to much weight.

Further, the theory that Tom turned to run away just as Petitioner decided to shoot, resulting in the final shot to the back, appears inconsistent with Tom's body position and Petitioner's testimony.  Petitioner testified that after he spoke with Tom, he walked towards the rear of Tom's vehicle.  11 RT 1808.  Petitioner then heard a loud explosion behind him, allegedly caused by Tom breaking the driver's seat window.  11 RT 1808-09.  Tom was thus standing at the front of the

United States District Court

For the Northern District of California

1   vehicle, while Petitioner stood at the back of the vehicle, when the shooting occurred.  If, as Jason

2   theorized, Tom had successfully completed a 180 degree turn resulting in the final shot to the back,

3   he would likely have either landed:  (1) if falling forward, face down, with his head towards the

4   front of the vehicle, or (2) if falling backward, face up, with his head toward the back of the vehicle.

5   Instead, Tom's body was found face up, with his head towards the front of the vehicle.  3 RT 506-

6   07.

7         There was thus a lack of foundation for the proffered expert testimony.  Trial counsel did not

8   err in failing to investigate and produce the reaction-response evidence.  Accordingly, the Court

9   finds that Petitioner has not established that trial counsel's performance was deficient.

10                    b.    Prejudice

11         Even if trial counsel had committed error by failing to investigate and present expert

12   testimony on wounds ballistics, the California Supreme Court could reasonably have found that

13   there was no prejudice arising from trial counsel's deficient performance.  To assess whether a

14   failure to find and present evidence was prejudicial, the Court "consider[s] the mitigating evidence

15   that was presented along with the new mitigating evidence and reweigh[s] all of it against the

16   aggravating evidence to determine whether there is a 'reasonable probability' that it would have

17   produced a different verdict."  *Samayoa*, 649 F.3d at 928.  In the instant case, the prosecution

18   presented substantial evidence demonstrating malice and undermining Petitioner's self-defense

19   story.  Thus, in addition to the lack of foundation for the study, given the overwhelming evidence of

20   guilt discussed below, it is unlikely that the introduction of the Tobin & Fackler study would have

21   altered the outcome of the case.

22                    i.    Multiple Shots

23         Petitioner fired a total of six shots, four of which hit Tom, indicating that Petitioner acted out

24   of anger rather than fear.  Although Petitioner argues that multiple shots were consistent with

25   Petitioner acting in fear and panic, Petitioner was a career peace officer who would have had

26   training and experience in handling violent situations, and Petitioner's gun was loaded with hollow

27   point bullets for self-protection, and Petitioner testified that these bullets were designed to stop a

28   person as quickly as possible.  12 RT 1791, 1793, 1803.  Thus, Petitioner likely knew that multiple

United States District Court

For the Northern District of California

1   shots would not be necessary to stop Tom. Accordingly, the California Supreme Court could

2   reasonably have found that the multiple shots suggest that Petitioner acted out of malice rather than

3   suggesting that Petitioner had simply panicked.

ii.   McNew's Testimony

5       The prosecutor introduced evidence that Petitioner intended to shoot Tom an hour before the

6   shooting occurred. Michael McNew, the owner of Baggy's, testified during the trial that after the

7   initial fistfight between Petitioner and Tom, Petitioner said that he was "going to go home and get a

8   gun and shoot the son of a bitch." 1 RT 174. McNew also repeated Petitioner's statements to

9   Officer Taupal immediately after the shooting, and to Sergeant Longmire the following day,

10   indicating that McNew did not make up the story. 4 RT 721-22; 10 RT 1624. Although Petitioner

11   challenges McNew's credibility, given McNew's friendship with Tom and dislike of Petitioner, the

12   California Supreme Court could reasonably have concluded that the jury credited McNew's

13   testimony. Thus, McNew's testimony demonstrated that Petitioner shot Tom out of anger, rather

14   than in self-defense.

iii.   Inconsistencies in Petitioner's Testimony

16       Petitioner's testimony suffered from multiple inconsistencies. First, Petitioner claimed that

17   Tom broke the window of his own car, causing Petitioner to fear for his life and act in self-defense.

18   11 RT 1808-09. However, it is unlikely that Tom could have broken the window; Tom's hands had

19   no injuries and the only tools in Tom's vehicles were located in the hatchback and not immediately

20   available to a person in the driver's seat. 5 RT 952, 975-76. Moreover, a good portion of the glass

21   was found *inside* the car. As Tom breaking the window was key to Petitioner's self-defense

22   argument, this evidence undermines Petitioner's case.

23       Second, Petitioner testified that Tom reached for a "black, shiny" object from his belt area

24   that Petitioner thought was a gun. 11 RT 1811. The only object close to Tom that could fit this

25   description was Tom's reading glasses case. However, Tom's sister testified that Tom always kept

26   his eyeglasses case in his shirt pocket, rather than his waist area, and provided picture

27   documentation of Tom keeping his glasses in his left breast pocket. 14 RT 2163-64. If Tom had

28   been reaching for his eyeglasses case, he would have taken it from his shirt pocket rather than his

1    waist.  Furthermore, Tom would have had no reason to reach for his reading glasses if he was

2    preparing to physically assault Petitioner, as one is more likely to remove their glasses before

3    entering a fight.  It is also unlikely that Petitioner could have mistaken the eyeglasses case from only

4    a few feet away.

5         Third, Petitioner claimed that he fired a warning shot, which struck a van parked two blocks

6    behind where Petitioner claims he was standing.  5 RT 1008.  Again, it is unlikely that Petitioner

7    would have fired a warning shot directly behind him and parallel to the ground, given the danger of

8    hitting someone.  Petitioner's claim that he fired a warning shot directly behind him is also

9    contradicted by Petitioner's testimony that he pointed the gun "in the air" and fired a warning shot,

10   before then testifying that he drew the gun and pointed it behind him.  *Compare* 11 RT 1810:1-4

11   *with* 11 RT 1810:13-21.

12        Fourth, the prosecutor introduced evidence that Tom was in need of money, contradicting

13   Petitioner's self-defense argument that Tom attacked him because Tom was desperate for money.

14   The prosecutor emphasized that Tom bought several drinks for Petitioner, and introduced evidence

15   of several major purchases that Tom made using cash, including paying $250 in cash for a stove and

16   purchasing a new 60-inch wide screen TV.  2 RT 363; 14 RT 2172.  Tom also had a large support

17   network, having come from a large family, none of whom he had discussed his "money problems"

18   with or asked for money from.  14 RT 2174; 16 RT 2537-38.  Tom's sister also testified that Tom

19   owned property in Nevada which he could have easily sold if he needed money, as well as a pickup

20   and the 60-inch wide screen TV.  14 RT 2174.  Based on these facts, the prosecutor argued that Tom

21   was not in such dire need of money that he would attack someone in order to get $200, as Tom could

22   have borrowed money from his family or sold back the appliances instead of charging at someone

23   who had a gun.  16 RT 2537.  This evidence undermined Petitioner's testimony by contradicting

24   Tom's motive for attacking Petitioner, casting doubt on whether Tom did in fact try to attack

25   Petitioner.

26        Fifth, Petitioner testified that when he returned to Baggy's after the initial fight, he spoke

27   with McNew, who allegedly said he would ask Tom to go out to speak with Petitioner.  11 RT 1801-

28   02.  Petitioner then drove around the block and parked on Third Avenue, which was next to the bar

United States District Court

For the Northern District of California

but out of the bar's view.  11 RT 1802.  If McNew had promised to ask Tom to go out to speak with

Petitioner, Petitioner would not have needed to drive away as he could have continued to park in

front of the bar.  The prosecutor had argued that Petitioner deliberately took the long way away and

drove around the block so he could not be seen, rather than making a u-turn which would have

required him to pass by Baggy's again.  16 RT 2574-75.  When Petitioner "pretended" to drive

away, he demonstrated that he did not expect McNew to send Tom out to talk to him and that he did

not want to be seen to still be near Baggy's.  While Petitioner testified that he moved his car because

he felt that McNew did not want him to be parked in front of Baggy's, this does not explain why

Petitioner made a u-turn instead of driving all the way around the block.

Sixth, Petitioner testified that McNew would not let Petitioner back into the bar because

McNew was "afraid there would be a gunfight."  11 RT 1801; 12 RT 1875.  Assuming McNew was

afraid there would be a gunfight, it is unlikely McNew would have also promised to send Tom out to

meet Petitioner and into a dangerous situation, especially since Petitioner claims that McNew was

very good friends with Tom and had a strong dislike for Petitioner.  The California Supreme Court

could reasonably have found that these multiple inconsistencies so undermined Petitioner's

testimony such that his self-defense argument was simply not credible.

iv.    <u>Petitioner Standing Over Tom's Body</u>

Directly contradicting Petitioner's self-defense theory, Officer Ruggiero testified that right

after the shooting occurred, he saw Petitioner standing over Tom, pointing his gun "downward at the

individual that was laying on the floor."  3 RT 506.  Officer Ruggiero further testified that Petitioner

was standing at Tom's head, and that Tom was lying face up.  3 RT 507.  This contradicted

Petitioner's testimony that he never stood over Tom's body or pointed a gun at Tom's head, again

negatively impacting his credibility.  12 RT 1903.  This testimony also contradicted Petitioner's

argument that he shot Tom in self-defense or while Tom was turning to run away, as Petitioner was

standing above the already fallen victim with his gun pointed at Tom's head.  A jury could infer

malice from Petitioner pointing a gun at Tom's head, especially when Tom was clearly no longer a

threat as he had already fallen after being shot at least three times.

United States District Court

For the Northern District of California

1    While Petitioner argues that he was in shock and was simply standing in the street with his

2    gun still pointed at Tom after shooting him, two contradictions arise from this statement.  First, if

3    Petitioner had not moved at all since shooting Tom, he would not have been pointing the gun at the

4    ground but at arm-level, towards the air, as Petitioner claimed that Tom had been charging at him

5    when Petitioner shot Tom.  Second, Petitioner's testimony placed him towards the back of the

6    vehicle as he testified that he had been backing away from Tom towards the rear of the vehicle when

7    he ultimately shot Tom.  11 RT 1808, 1811-12.  In contrast, Officer Ruggiero testified that Petitioner

8    was standing at Tom's head close to the front of the vehicle.  3 RT 506-07.  By standing over Tom's

9    body, with his gun pointed at the victim who was no longer a threat, the California Supreme Court

10   could reasonably find that Petitioner's actions strongly suggested that he acted out of malice rather

11   than self-defense.

v.    Blood Trail

13   The prosecutor introduced evidence of a 9-foot trail of blood drops that suggest that Tom

14   was shot and was starting to crawl away before being shot again.  5 RT 863-70, 962, 969-70.  This

15   would also undermine Petitioner's self-defense argument and demonstrate malice, as it would

16   suggest that Tom was already injured from the first shot, and that there was no need to continue

17   shooting him when he was no longer capable of attacking.  The blood trail could also suggest that

18   Tom was trying to escape, and that the subsequent shots were no longer in self-defense.  Based on

19   the blood trail evidence, the California Supreme Court could reasonably find that the shooting of

20   Tom was deliberate rather than in self-defense.

vi.    Actions After the Shooting

22   Finally, Petitioner's actions after the shooting also demonstrate that the shooting was not in

23   self-defense.  After the shooting, Petitioner left Tom dying in the street, walking over to his car and

24   driving away instead of attempting to help Tom or remaining at the scene to explain his actions to

25   law enforcement.  During this time, Petitioner disposed of the murder weapon another indication of

26   consciousness of guilt.  11 RT 1813.

27   There was also some evidence that Petitioner attempted to disguise himself by shaving off

28   his beard, as Petitioner was clean-shaven when he was arrested the day after Tom's death.  Officer

**United States District Court**

For the Northern District of California

1    Ruggiero and McNew testified that Petitioner still had his beard during the shooting, while Eoghan

2    Canniffe testified that Petitioner was clean-shaven at the time of the shooting.  *Compare* 3 RT 463

3    *with* 1 RT 178, 3 RT 513.  If the jury found that Ruggiero and McNew were more credible than

4    Canniffe, the jury could have found that Petitioner had shaved off his beard and was actively trying

5    to disguise himself.

6           Further, when Petitioner was arrested and taken to the police station, Petitioner did not

7    mention Petitioner's attack on Tom during the shooting.  Instead, after the officers took Petitioner to

8    the interview room and informed him that they wanted to talk about an incidence with Tom,

9    Petitioner immediately said that Tom had punched him before the shooting and gestured at his face.

10   9 RT 1419-20.  Petitioner did not mention Tom's attack on him during the shooting, even though

11   Tom's alleged attack was why Petitioner had shot Tom.  As Petitioner would likely have mentioned

12   the attack during the shooting rather than the attack prior to the shooting, Petitioner's failure to

13   mention the later attack further suggests that no such attack occurred.

14          Taken together, the California Supreme Court could reasonably find that any error

15   committed by defense counsel in failing to present the reaction-response evidence was not

16   prejudicial.  Even when considering the reaction-response evidence, there is still substantial

17   evidence that Petitioner had shot Tom out of anger rather than in self-defense.  Petitioner made

18   threats about killing Tom after the initial fight, and came back to the scene and actively avoided

19   being within view of the bar after McNew told him to leave.  During the shooting, Petitioner shot

20   Tom multiple times with hollow point bullets and was found standing over Tom with a gun pointed

21   at his head, and there was a blood trail indicating that Tom had been shot and tried to escape before

22   being shot again.  Petitioner then fled the scene, tried to disguise himself, ditched the gun, and did

23   not mention Tom's alleged attack on him during the shooting when he was arrested.  Further,

24   Petitioner's testimony was significantly undermined by inconsistencies, such as the fact that Tom

25   was not in desperate need of money, Tom's inability to break the window, and the unlikelihood that

26   Petitioner could have thought that Tom's eyeglasses case was a gun or fired a warning shot directly

27   behind him.

28

United States District Court

For the Northern District of California

1    Accordingly, the Court finds that the California Supreme Court could reasonably find that no

2  prejudice arose from defense counsel's performance.

3        2.    Failure to Request Jury Instruction CALJIC 5.50.1

4    The Court finds that trial counsel did not commit prejudicial error by failing to request

5  CALJIC 5.50.1.  When evaluating a claim of instructional error, the jury instruction in question

6  "may not be judged in artificial isolation, but must be considered in the context of the instructions as

7  a whole and the trial record."  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  Further, where the

8  alleged error is the failure to give an instruction, "the respondent's burden is especially heavy

9  [because a]n omission, or an incomplete instruction, is less likely to be prejudicial than a

10  misstatement of the law."  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

11    Here, Petitioner contends that trial counsel rendered ineffective assistance by failing to

12  request CALJIC 5.50.1, which states:

13        Evidence has been presented that on [a] prior occasion[s] the alleged
        victim [threatened] [or] [assaulted] [or participated in an assault or
14        threat of physical harm upon] the defendant. If you find that this
        evidence is true, you may consider that evidence on the issues of
15        whether the defendant actually and reasonably believed [his] [her] life
        or physical safety was endangered at the time of the commission of the
16        alleged crime.

17        In addition, a person whose life or safety has been previously
        threatened, or assaulted by [another] [others] is justified in acting more
18        quickly and taking harsher measures for self protection from an assault
        by [that person] [those persons], than would a person who had not
19        received threats from or previously been assaulted by the same person
        [or persons].

20

21    California courts have found prejudicial error where a trial court refused to instruct a jury on

22  the effect of prior threats because the standard self-defense instructions focus on the defendant's fear

23  of "imminent" danger and the "immediate" circumstances of the event.  *See People v. Torres*, 94

24  Cal. App. 2d 146, 151 (1949); *People v. Bush*, 84 Cal. App. 3d 294, 304 (1978); *People v. Pena*, 151

25  Cal. App. 3d 462, 476 (1984).  Thus, absent a clear instruction permitting the jurors to consider prior

26  events, standard self-defense instructions focusing only on the immediate circumstances could

27  wrongfully suggest to jurors that they could *only* consider the immediate circumstances.  *E.g.*, *Pena*,

28  151 Cal. App. 3d at 476 ("Absent a clear instruction to consider defendant's knowledge of the

United States District Court

For the Northern District of California

1   uncontradicted antecedent threats made by [the victim] to him and to others about him, we cannot be

2   sure jurors did not construe instructions that were proffered as narrowing the scope of facts and

3   circumstances which they were entitled to consider to only those perceived by any other 'reasonable

4   man' approached by [the victim in the immediate circumstances].")

5       In the instant case, Petitioner contends that CALJIC No. 5.50.1 was critical to his self-

6   defense argument by negating the prosecutor's malice theory, which relied in part on the number of

7   shots fired by Petitioner to demonstrate that Petitioner was not acting in self-defense. *E.g.*, 16a RT

8   2582. Petitioner argues that if CALJIC No. 5.50.1 was issued, the jury could have found that the

9   number of shots fired by Petitioner was reasonable given the prior fight that had occurred between

10   Petitioner and Tom. Trial counsel has declared that the failure to request CALJIC 5.50.1 was not a

11   tactical decision, but the result of oversight. Cooper Decl. ¶ 6.

12       The California Supreme Court could reasonably have found that there was no error in failing

13   to request CALJIC 5.50.1. There was no evidence that Petitioner considered the prior fight between

14   himself and Tom when he shot Tom. Petitioner never testified to any fear of Tom as a result of the

15   prior fight. Instead, Petitioner claimed that he returned to Baggy's after the prior fight because he

16   professed to being worried about Tom, rather than trying to avoid Tom because he was scared of

17   being attacked again. 12 RT 1847. It is significant that Petitioner decided to reinitiate contact with

18   Tom, as it shows no fear of Tom based on the prior fight. In Petitioner's testimony about the

19   shooting, Petitioner never considered the prior fight. Instead, Petitioner focused on the immediate

20   circumstances of the shooting, *i.e.*, his belief that Tom was reaching into his pocket for a weapon,

21   the broken window, and Tom charging at him. 12 RT 1889-90. Petitioner never testified that he

22   acted in self-defense because of the prior fight, or that he even considered the prior fight. Thus, the

23   requested instruction was inapplicable based on the facts at trial.

24       Likewise, during closing argument, trial counsel discounted the significance of the prior fight

25   as "a simple punch in the face" and emphasized that "[t]his case is about self-defense at 11:32 p.m.,

26   not the fistfight, not the fight at 9 p.m." 16 RT 2483. Rather than suggest that the prior fight put

27   Petitioner in fear of his life, the closing argument distinguished the prior fight and focused solely on

28   the actions that took place fight before the shooting. 16 RT 2484-85. Both Petitioner's testimony

**United States District Court**
For the Northern District of California

1   and the closing argument focused exclusively on Petitioner's fear of Tom right before the shooting,

2   which were covered by the standard self-defense instructions.  This tactical decision by counsel to

3   distinguish the two fights and emphasize the immediate circumstances is entitled to deference.  Once

4   that tactical decision was made, the CALJIC 5.50.1 became immaterial to the case.  Petitioner never

5   gave any reason for the jury to consider the prior fight as a reason for Petitioner's actions or fear.

6        Even if trial counsel's performance was deficient in failing to request CALJIC 5.50.1, the

7   California Supreme Court could still reasonably find that trial counsel's error was not prejudicial.

8   As discussed above, there was significant evidence demonstrating malice and undercutting

9   Petitioner's self-defense story.  In addition to arguing that Tom was shot four times, the prosecutor

10   also introduced evidence that Petitioner had threatened to kill Tom, and that upon his return to

11   Baggy's hid from view after McNew told him to leave.  During the shooting, Petitioner shot Tom in

12   the back and was found standing over Tom with a gun pointed at Tom's head.  The prosecutor also

13   introduced evidence of a blood trial, indicating that Tom had attempted to escape after being shot at

14   least once.  Petitioner then left the scene of the crime, throwing away his gun and potentially trying

15   to disguise himself by shaving of his beard.  The prosecutor also undermined Petitioner's self-

16   defense argument, raising doubts on whether Tom had in fact tried to attack Petitioner first.  For

17   example, there was evidence that Tom was not in desperate need of money, *i.e.* the alleged motive

18   for Tom's attack on Petitioner, that Tom could not have broken the window, and the unlikeliness

19   that Petitioner could have thought Tom was trying to pull out a weapon.  Petitioner's own testimony

20   was also inconsistent, such as his firing a warning shot in the air before stating that he fired the

21   warning shot directly behind him.

22        Taken together, both because the instruction had no substantial evidentiary basis and was not

23   consistent with counsel's defense theory and because it would not have changed to outcome, the

24   California Supreme Court had a reasonable basis for denying Petitioner's ineffective assistance of

25   counsel claim, and the Court will not disturb the state court's ruling on this issue.

26   C.   Prosecutorial Misconduct

27        A defendant's due process rights are violated when prosecutorial misconduct renders a trial

28   "fundamentally unfair."  *Darden v. Wainwright*, 477 U.S. 168, 183 (1986); *see also Smith v.*

United States District Court

For the Northern District of California

1 *Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged

2 prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). Under

3 the *Kotteakos* prejudice standard, the error must have "substantial and injurious effect or influence in

4 determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting

5 *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "Under this standard, habeas petitioners may

6 obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based

7 on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.*

8          In the instant case, Petitioner claims that the prosecutor committed misconduct during the

9 prosecutor's cross-examination of Petitioner and closing arguments. Docket No. 56 at 28

10 ("Traverse"). As discussed above, Petitioner's prosecutorial misconduct claims were raised in his

11 appeal, but in the last reasoned decision, the California Court of Appeal refused to consider the

12 majority of his claims under the contemporaneous objection rule. *See Smith*, 2004 Cal. App. Unpub.

13 LEXIS 10325, at *10-13. Judge Patel subsequently found that the contemporaneous objection rule

14 was an inadequate procedural bar that did not bar this Court's review of Petitioner's claims.

15 Accordingly, where the California Court of Appeal adjudicated Petitioner's prosecutorial

16 misconduct claim on the merits, this Court will apply § 2254(d)'s deferential standard. Where,

17 however, the California Court of Appeal did not adjudicate the merits of the challenged statement,

18 the Court will review *de novo*. As discussed below, the Court finds that even reviewing Petitioner's

19 claims *de novo*, Petitioner has not established that the prosecutor committed prejudicial misconduct.

20          1.    <u>Cross-Examination</u>

21                a.    <u>Insinuating that Petitioner Hid or Destroyed Evidence</u>

22          Petitioner contends that the prosecution committed misconduct when she cross-examined

23 Petitioner about the clothes he was wearing at the time of the shooting, and strongly insinuated that

24 Petitioner deliberately hid or destroyed the clothing which would have been probative to his self-

25 defense claim. Petition at 11; Traverse at 29. Petitioner argues that by suggesting that the clothes

26 could have "absolutely" proven his innocence and Petitioner's failure to provide such exculpatory

27 evidence to his defense counsel or the police, the prosecutor engaged in misconduct. Petitioner

28 challenges whether the clothing could have "absolutely" proven his innocence and argues that the

**United States District Court**

For the Northern District of California

1  prosecutor wrongfully insinuated its significance and hence Petitioner's guilt in failing to produce

2  the clothing.

3       The Court must defer to the California Court of Appeal as to the question reviewed by the

4  state court, and will review the remaining questions *de novo*.  The one question reviewed by the

5  California Court of Appeal concerned the prosecutor's question, "You didn't hand over those items

6  [of clothing] so [defense counsel] could test your actual theory of self-defense?"  12 RT 1914-15.

7  The California Court of Appeal found that this question did not suggest that the prosecutor had

8  specific knowledge that the clothing was determinative of Petitioner's guilt or innocence.  *Smith*,

9  2004 Cal. App. Unpub. LEXIS 10325, at *15.  Instead, the California Court of Appeal found that the

10  prosecutor was only suggesting that the clothing *could* have evidentiary value if Petitioner had made

11  them available for testing.  *Id.*  For example, glass shards on the back of the clothing could have

12  supported Petitioner's claim that he was walking away when Tom broke the window, while gunshot

13  residue could have supported his contention that he fired a warning shot behind him.  *Id.* at *15 n.2.

14  Likewise, vomit on the front of the shirt could have supported Petitioner's account of thee vents

15  after the shooting.  *Id.*  Thus, the prosecutor's speculation that the clothing could have probative

16  value was not improper, as there was a reasonable basis for believing that the clothing could contain

17  evidence substantiating Petitioner's claim.  *Id.*

18       The California Court of Appeal also found that the questioning did not "shift the burden of

19  proof."  *Id.* at *16.  While it is error for a prosecutor to comment on a defendant's failure to testify,

20  "that rule does not extend to comments on the state of the evidence or on the failure of the defense to

21  introduce material evidence or to call logical witnesses."  *People v. Vargas*, 9 Cal. 3d 470, 475

22  (1973); *see also People v. Brady*, 50 Cal. 4th 547, 566 (2010) ("The prosecutor's comments, rather

23  than being a direct (or even indirect) reference to defendant's silence, constituted reasonable

24  comment on defendant's failure to introduce material evidence or logical witnesses.").  Thus, calling

25  the jury's attention to potentially exculpatory evidence that the defendant failed to present does not

26  suggest that the defendant had a formal burden of proof.  The California Court of Appeal's finding

27  was reasonable, as there was a legitimate belief that the clothing could contain evidence and that

28  Petitioner's failure to bring forth his clothing was relevant to his guilt.

**United States District Court**

For the Northern District of California

As to the remaining questions, the Court reviews those statements *de novo* because the California Court of Appeal did not review these questions because the remaining questions were either not objected to or were subject to sustained objections. *Smith*, 2004 Cal. App. Unpub. LEXIS 10325, at *13-14. The remaining questions by the prosecutor focused on why Petitioner failed to hand over the clothing, to which Petitioner responded that he was incarcerated and could not hand over any clothing that was in his apartment. 12 RT 1915. The prosecutor asked if Petitioner knew of anyone who could have turned over the clothes, and concluded, "there were people who . . . could have helped you bring this evidence forward and ascertain your absolute innocence, right?" 12 RT 1915. The trial court sustained the objection to this question. 12 RT 1915.

The Court finds that these questions did not constitute misconduct. As the California Court of Appeal noted, it is not improper for a prosecutor to comment on a failure to introduce material evidence, and the clothing here could have been probative. There is no evidence that the prosecutor lacked a good faith belief that the clothing could have gunshot residue, broken glass, or vomit, all of which would have supported Petitioner's self-defense story. Although the prosecutor suggested that the clothing could have ascertained Petitioner's "absolute innocence," the trial court sustained the objection to this question and the prosecutor did not follow up on this line of questioning.[8] Taken together, simply calling the jury's attention to potentially exculpatory evidence and Petitioner's failure to present the clothing does not suggest that Petitioner had a formal burden of proof, and does not constitute misconduct. *Vargas*, 9 Cal. 3d at 475.

      b.   <u>Misstating the Pathologist's Testimony on BAC</u>

Petitioner challenges the prosecutor's questions asking Petitioner to speculate as to his blood alcohol level at the time of the shooting. Petition at 12. Petitioner contends that the in making Petitioner testify about his blood alcohol level, the prosecutor significantly misstated Dr. Van Meter's testimony, and that this misstatement of evidence violated Petitioner's right to due process.

---

[8] Where a curative instruction is issued, the Court presumes that the jury has disregarded inadmissible evidence and that no due process violation has occurred. This presumption is only overcome where there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the defendant. *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987). Petitioner does not argue that there is any reason to believe the jury would not have respected the objection.

**United States District Court**

For the Northern District of California

1   Traverse at 33.  Dr. Van Meter had explained that as a "rule of thumb," one's blood alcohol level

2   could be calculated by multiplying .02 percent times the number of drinks consumed by a person.

3   However, Dr. Van Meter also stated that the exact level depended on a number of different factors,

4   such as the size of the drinker, the speed of consumption, the time elapsed since consumption, and

5   the type and size of drink.  6 RT 1140-48.  Based on this testimony, the prosecutor asked Petitioner

6   to calculate his blood alcohol level based solely on the number of drinks Petitioner had that evening;

7   in doing so, the prosecutor did not discuss the other factors identified by Dr. Van Meter.  12 RT

8   1864-66.

9        The Court of Appeal considered this issue in its entirety.  Accordingly, § 2254(d) applies and

10  the Court must defer to the state court's findings.  The California Court of Appeal found that

11  although the prosecutor "undoubtedly oversimplified the expert's testimony," it could not "conclude

12  that this oversimplification constituted misconduct because it is unclear from the record whether it

13  constituted a deliberate mischaracterization of the expert's testimony, rather than a simple

14  misunderstanding."  *Smith*, 2004 Cal. App. Unpub. LEXIS 10325, at *17-18.  The California Court

15  of Appeal also noted that while Petitioner correctly argued that a prosecutor commits misconduct

16  when mischaracterizing evidence during closing argument, there were no cases suggesting that

17  mischaracterizing evidence during cross-examination constitutes misconduct.  *Id.* at *18.  Instead,

18  the California Court of Appeal found that "[t]he considerations are quite different during

19  examination and closing argument because of the interactive nature of examination, which allows a

20  ready opportunity for the error to be pointed out and corrected."  *Id.*  In contrast, "'closing argument

21  is an especially critical period of trial' because it represents the parties' opportunity to address the

22  jury directly and marshal the evidence to persuade."  *Id.* at *19 (quoting *People v. Pitts*, 223 Cal.

23  App. 3d 606, 694 (1990).  Indeed, during cross-examination, Petitioner fully countered the

24  prosecutor's oversimplification of Dr. Van Meter's testimony while responding to her questions,

25  correctly stating Dr. Van Meter's testimony that there were numerous factors that had to be

26  considered in calculating one's blood alcohol level.  12 RT 1866.

27        Furthermore, the California Court of Appeal reasonably found that the prosecutor did not

28  commit misconduct in asking Petitioner to calculate his blood alcohol level.  Again, Petitioner has

**United States District Court**
For the Northern District of California

not provide any case law holding that mischaracterization of evidence during cross-examination constitutes misconduct.  He relies only on cases that discuss mischaracterization during closing arguments.  *See United States v. Beckman*, 222 F.3d 512, 526 (8th Cir. 2000) (concerning facts not in evidence during the closing argument); *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000) (mischaracterizing the defendant's conversations with different individuals during closing argument); *Paxton v. Ward*, 199 F.3d 1197, 1216 (10th Cir. 1999) (mischaracterizing the reasons for a prior dismissal of the case during closing argument).  Thus, Petitioner fails to demonstrate that the state court's decision was contrary to any clearly established federal law.

Even if the California Court of Appeal erred in finding that the prosecutor did not commit misconduct, any error was harmless.  The state court found that Petitioner's exact blood alcohol level was immaterial as Petitioner had already testified to his drinking patterns that night.  *Smith*, 2004 Cal. App. Unpub. LEXIS 10325, at *19-20.  This description was "more meaningful to the jury in determining the degree to which his conduct was impaired by alcohol than any attempt by the prosecutor to translate this into the percentage of alcohol in his blood."  *Id.* at *20.  Thus, the jury could have inferred that Petitioner was intoxicated at the time of the shooting given the number of drinks he had and still found him guilty.  Further, Petitioner's blood alcohol level was relatively collateral as it was not a significant part of the prosecutor's case; instead, the prosecutor focused primarily on other evidence such as the number of shots fired, the shot in the back, the contradictions in Petitioner's testimony, and McNew's testimony about Petitioner's threat to Tom.  Intoxication therefore did not play a significant role in either side's explanation of the shooting.

Accordingly, this Court finds that the state court's finding of no prejudicial error was based on a reasonable determination of the facts in light of the evidence presented in the state court proceeding.

c.    <u>Insinuating that Plaintiff had Bad Character</u>

i.    <u>Gambling</u>

Petitioner challenges the prosecutor's questions during cross about Petitioner's gambling habits, which Petitioner contends were designed to create the impression that Petitioner was a heavy gambler even though Petitioner's gambling habits were irrelevant to his self-defense argument.

**United States District Court**

For the Northern District of California

Petition at 14.  The prosecutor engaged in extended cross-examination about Petitioner's visit to a Nevada casino about a week before the shooting, during which Petitioner claimed he cashed a check for $1,000.  Petitioner earmarked half of the cash for gambling, and kept the remainder to pay for a laptop for his daughter.  Petitioner later claimed that he had the $500 in his wallet when he spoke with Tom, which allegedly prompted Tom to ask Petitioner for money.

Again, the California Court of Appeal applied the contemporaneous objection rule to bar review of the majority of the challenged questions, and reviewed only one question in which the prosecutor asked Petitioner, "You're very good with will power, so you can just stop [gambling] at $500, right?"  12 RT 1822.  The California Court of Appeal found that this question was relevant because the purpose of the question was to suggest that Petitioner "had gambled extensively during the trip, perhaps using up the $500 he claimed to have reserved for the computer."  *Smith*, 2004 Cal. App. Unpub. LEXIS 10325, at *21.  Possession of the $500 cash on the night of the shooting was an important part of Petitioner's testimony, as it provided the motivation for Tom's alleged attack on Petitioner.  The state court thus found that "the prosecutor was justified in questioning the credibility of [Petitioner's] story by pointing out the temptation to gamble away the money."  *Id.* at *22.  Thus, the purpose of the question was not to attack Petitioner's character, but to challenge whether Petitioner in fact had on hand the $500 he claimed caused Tom to attack him.  The California Court of Appeal's conclusion that the prosecutor did not commit misconduct is reasonable, as the question was directly relevant to Tom's alleged motive for attacking Petitioner.

The Court reviews the remainder of the questions on cross-examination *de novo*.  The remaining questions concerned whether Petitioner deliberately cashed the $1,000 check in order to "intentionally try to deceive the hotel so you could get a free room."  12 RT 1824.  Like the question regarding Petitioner's gambling habits, these questions concerned whether Petitioner did in fact keep the latter $500, or if he had used it to get a hotel room.  The prosecutor followed up on these questions by questioning whether Petitioner held onto the $500 despite having bills that he needed to pay, or if Petitioner really kept the money separate in his wallet for the entire week.  12 RT 1827-28.  These questions were all relevant to whether Petitioner in fact had the $500 on the night of the killing.  The prosecutor did not commit misconduct in asking the challenged questions.

ii.    Drinking

Petitioner also contends that the prosecutor asked a series of questions seeking to portray Petitioner as a long-time problem drinker. Petition at 14; Traverse at 38. The prosecutor asked at what age Petitioner had started drinking, how often he drank, where he would drink, and whether he considered himself a problem drinker. 12 RT 1806-10. Petitioner argues that these questions were irrelevant, and were designed to imply he had bad character.

The Court will review this claim *de novo*, with the exception of the one question reviewed by the California Court of Appeal. The California Court of Appeal found that a question about whether Petitioner as a teenager drank when he went out hunting with his uncles was not misconduct, as it was so remote in time that it was of marginal relevance. Given the marginal relevance of this question, the Court defers to the state court's finding that this question was not misconduct. Nor was it prejudicial.

As to the other questions not analyzed by the state court, the questions were not prejudicial. Petitioner had the opportunity to explain that he did not drink much when he was young, and his drinking patterns as a young man were consistent with many other people's experiences. As the questions were collateral and would at best have had limited impact on the jury's verdict, the Court finds that these questions do not constitute prejudicial misconduct.

iii.    Weapons

Petitioner contends that the prosecutor attempted to portray Petitioner as a reckless gun owner who disregarded the law and purchased weapons and ammunition to maximize his ability to kill innocent people. Petition at 14-15; Traverse at 39.

The prosecutor engaged in two lines of questioning. First, the prosecutor asked Petitioner about his carrying a loaded firearm in his car glove box without a concealed weapons permit. 11 RT 1849-51; 12 RT 1803-04. The prosecutor asked if Petitioner agreed that his violation of the law led to Tom's death. 12 RT 1804-06. This Court defers to the California Court of Appeal's review of the questions addressed by the state court, and apply *de novo* review to the remaining questions. The California Court of Appeal reviewed: (1) a question about whether Petitioner rarely took his gun to a shooting range while working as a fraud inspector was because he knew he was not supposed to

**United States District Court**
For the Northern District of California

be carrying a gun, (2) three questions connecting Petitioner's illegal possession of a concealable weapon to Tom's death, and (3) a question about whether Petitioner would care if a kid broke into his car and stole his gun. *Smith* 2004 Cal. App. Unpub. LEXIS 10325, at *24-26. The California Court of Appeal found that none of these questions constituted misconduct because one of the factual issues in dispute was whether Petitioner in fact "returned home to fetch his gun, as the bar owner testified, or whether he kept a loaded gun in his car, as [Petitioner] testified." *Id.* at *26. By emphasizing the serious risks of keeping a loaded gun in a car, the prosecutor sought to cast doubt on Petitioner's testimony that he constantly carried a dangerous weapon in his car as "[t]he more substantial the risks, the less likely that defendant actually kept the gun in his glove compartment, rather than driving home to get the gun." *Id.* at *27. The Court finds that the California Court of Appeal's conclusion was reasonable, as the questions sought to illustrate that Petitioner specifically went home to get a gun to carry out his threat on Tom.

Petitioner challenges other questions that the California Court of Appeal did not review, which this Court will review *de novo*. These questions included whether Petitioner believed he was authorised to carry a weapon when he was employed as a welfare fraud officer although it was against agency policy, as well as asking whether Petitioner would have cared if someone broke into his car and stole his gun to commit crimes. 12 RT 1848, 1852-53, 1856-60. Again, all of these questions emphasized the risks of keeping a loaded gun in his glove compartment and raised doubts that Petitioner in fact kept a gun in his car. If Petitioner did not keep a gun in his car, the prosecutor's theory that Petitioner had gone home to get a gun would become a more likely alternative to Petitioner's self-defense argument, and would demonstrate malice and premeditation. Accordingly the Court finds that the remaining questions did not constitute misconduct because they sought to uncover relevant information.

Second, the prosecutor asked Petitioner a series of questions about the type of guns and ammo Petitioner kept and their killing potential. 12 RT 1802-03. Petitioner contends that these questions were inappropriate because they were intended to portray Petitioner "as a despicable, crazed gun owner," and that such questions were not relevant to the crime. Traverse at 41. Although the California Court of Appeal considered one of these questions, it did not actually

United States District Court

For the Northern District of California

1    analyze or explain why the question did not constitute misconduct.  Thus, the Court reviews this line

2    of questioning *de novo*.

3         The Court finds that these questions did not constitute misconduct, as they were relevant to

4    the prosecutor's theory of the crime.  Again, the questions about the type of ammo and guns used by

5    Petitioner went to the issue of whether Petitioner in fact kept a loaded gun in his glove compartment.

6    The weapons and ammo used by Petitioner were extremely dangerous, with Petitioner testifying that

7    he specifically used hollow point bullets to stop people as quickly as possible.  12 RT 1791.  These

8    questions would have bolstered the prosecutor's argument that Petitioner did not keep such a

9    dangerous weapon in his glove compartment, but that he instead returned home to get a gun.

10        Furthermore, the prosecutor also emphasized the number of shots fired by Petitioner to

11   demonstrate malice.  Petitioner shot at Tom at least four times; if, however, the guns and ammo he

12   used were designed to stop a person in their tracks, he would not have needed to fire so many shots

13   at Tom for self-protection, as fewer shots would have been sufficient.  *See* 12 RT 1803.  Thus, the

14   prosecutor argued that the number of shots demonstrated malice rather than panic.

15        Accordingly, the Court finds that these questions did not constitute misconduct, as they not

16   only emphasized the unlikelihood that Petitioner would have kept the gun in his car, but suggested

17   that Petitioner acted in anger rather than panic when he fired multiple shots at Tom.

18             d.        Interjection of Petitioner's Purportedly Racist Comments

19        Petitioner challenges the prosecutor's questions regarding whether Petitioner called Tom

20   "Navajo."  Petition at 15-16; Traverse at 43.  Petitioner argues that these questions were irrelevant to

21   whether Petitioner shot Tom in self-defense, and that the prosecutor only asked the questions to

22   make Petitioner appear as a racist and prejudice the jury against him.  Traverse at 44.

23        The Court reviews this subclaim *de novo*, as the Court of Appeal applied the

24   contemporaneous objection rule to bar consideration of all challenged questions.  The Court finds

25   that the prosecutor's use of the term "Navajo" was not an error.  First, the issue was highly relevant,

26   as the prosecutor contended that the initial fist fight between Petitioner and Tom was not about

27   money, but because Tom was tired of being called "Navajo" by Petitioner.  *See* 16 RT 2569.  Thus,

28   the term "Navajo" was relevant as an alternative explanation for the initial fist fight.  As Petitioner

United States District Court

For the Northern District of California

claimed that Tom attacked him because Tom was desperate for money, forcing Petitioner to act in self-defense, an alternative explanation for the fist fight would undermine Petitioner's testimony. Accordingly, the prosecutor did not commit misconduct by questioning Petitioner about his use of the term "Navajo."

Second, even if there was misconduct, the prosecutor's use of the term "Navajo" was not prejudicial as Petitioner's use of the term was previously emphasized by defense counsel during his questioning of McNew and Sanchez. 1 RT 254; 2 RT 339-41, 360-63, 385, 396-97. As Petitioner's own attorneys had already brought up the term and spent a significant portion of time discussing Petitioner's use of the term, the prosecutor's use of the term when questioning Petitioner likely had little additional effect. Furthermore, Petitioner had sufficient opportunity to explain why the term was not negative; Petitioner explained that he called Tom "Navajo" and Tom in turn called him "Okie," even though Petitioner was not from Oklahoma. 12 RT 1833-36. As Petitioner had the opportunity to explain why he was not being racist when he used the term, and gave a long explanation for how the names were part of his relationship with Tom, this line of questioning did not result in prejudice to Petitioner. The Court finds that these questions do not constitute prejudicial misconduct.

> e.    Asking Petitioner to Testify Whether Other Witnesses were Lying

Petitioner contends that on two separate occasions, the prosecutor forced Petitioner to testify as to whether two of the state's witnesses were lying. Petition at 16-17; Traverse at 45-46. A prosecutor's questions compelling a defendant to give his opinion regarding the credibility of a witness can be reversible error. Error arises because "it is the jurors' responsibility to determine credibility by assessing the witnesses and witness testimony in light of their own experience. Testimony regarding a witness'[s] credibility is prohibited unless it is admissible as character evidence." *United States v. Geston*, 299 F.3d 1130, 1136 (9th Cir. 2002).

The California Court of Appeal reviewed one set of questions, in which the prosecutor asked Petitioner to testify about Sergeant Longmire's truthfulness. The Court applies § 2254(d) deference to this question. The prosecutor asked whether Petitioner recognized that there was partially jacketed and fully jacketed cartridges in his .380 weapon, which was not the gun used in the

United States District Court

For the Northern District of California

shooting. 12 RT 1799. Petitioner responded, "If those were taken from my weapon, I assume I did yes." 12 RT 1799. The prosecutor then asked if Petitioner meant to challenge Sergeant Longmire's truthfulness when Sergeant Longmire said he recovered that ammo from Petitioner's gun. 12 RT 1799-1800. The California Court of Appeal found that while the question was likely objectionable, it was not prejudicial because the evidentiary point, *i.e.* the type of ammo Petitioner kept in a gun that was not used in the shooting, was subsidiary and had no real significance. *Smith*, 2004 Cal. App. Unpub. LEXIS 10325, at *31-32. Furthermore, Petitioner's answers made clear that he was not challenging Sergeant Longmire's testimony, but that he simply did not want to speculate because he was not present when the police searched his house and he therefore had no idea what the police did or did not do. *Id.* at *32. Thus, the question was not prejudicial because the exchange was on a collateral issue and if anything, reflected badly on the prosecutor and her tactics. *Id.* Petitioner does not argue that there was prejudice from this question, and the Court finds that the state court's conclusion that there was no prejudicial error was reasonable.

As to the prosecutor's questions regarding Officer Ruggiero's truthfulness, the Court reviews this question *de novo* because the California Court of Appeal did not review this question. Officer Ruggiero had previously testified that he saw Petitioner standing over Tom with his gun pointed down at Tom. After Petitioner testified that he never stood over Tom's body, the prosecutor asked if Officer Ruggiero's testimony was "inaccurate." 12 RT 1904. Petitioner responded that either Officer Longmire or Officer Ruggiero was lying, as Officer Longmire claimed that Officer Ruggiero had told him that he saw Petitioner shoot Tom, while Officer Ruggiero testified that he did not see Petitioner shoot Tom. 12 RT 1904. The prosecutor asked if Petitioner was the only one who was telling the truth, to which Petitioner responded that he was certain that he was not. 12 RT 1904. The prosecutor then asked if Petitioner was not telling the truth, and before Petitioner could finish responding, the prosecutor cut Petitioner off. 12 RT 1904. This act was objected to and sustained.

Unlike the prosecutor's questions regarding Officer Longmire, this series of questions was not on a collateral issue, as the underlying evidentiary point was whether Petitioner had in fact stood over Tom's body with a gun pointed at him. This issue concerns malice, and is important to the case. The questions regarding whether Officer Ruggiero's testimony was "inaccurate" and the

United States District Court

For the Northern District of California

1    ensuing questions regarding whether Officer Ruggiero was telling the truth and if Petitioner himself

2    was telling the truth are all likely misconduct by the prosecutor.

3           While these questions were misconduct, improper questions only entitle Petitioner to habeas

4    relief if the error "had substantial and injurious effect or influence in determining the jury's verdict."

5    Petitioner argues that these questions constituted a "serious blow" to his credibility.  Traverse at 46

6    n.35.  However, when the prosecutor directly asked if Petitioner was not telling the truth, the trial

7    court sustained an objection to the question.  Thus, the Court will presume that the jury did not

8    consider the impermissible question.  *See Greer*, 483 U.S. 766 n.8.  Furthermore, as discussed above

9    there was other substantial evidence undermining the credibility of Petitioner's self-defense

10   argument, as well as evidence that demonstrated malice and contradicted Petitioner's testimony.

11   Given the sustained objection and the substantial other evidence undermining Petitioner's self-

12   defense claim, the Court finds that the questions regarding Officer Ruggiero's truthfulness were not

13   prejudicial.

14                  f.      Belittling and Badgering Petitioner During Cross-Examination

15          Petitioner contends that throughout the prosecutor's cross-examination of Petitioner, the

16   prosecutor was rude and asked many sarcastic and argumentative questions.  Petition at 17-21;

17   Travers at 46-47.  The Supreme Court has found that prosecutors have a "twofold aim of which is

18   that guilt shall not escape or innocence suffer."  *Berger v. United States*, 295 U.S. 78, 88 (1935).

19   While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones.  It is as much his

20   duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use

21   every legitimate means to bring about a just one."  *Id.*  This duty is justified by the fact that "the

22   average jury . . . has confidence that these obligations, which so plainly rest upon the prosecuting

23   attorney, will be faithfully observed.  Consequently, improper suggestions, insinuations, and,

24   especially, assertions of personal knowledge are apt to carry much weight against the accused when

25   they should properly carry none."  *Id.*

26          For example, in *People v. Hill*, the California Supreme Court found prosecutorial misconduct

27   where the prosecutor misstated evidence, made sarcastic and critical comments demeaning defense

28   counsel, and stating outright falsehoods.  17 Cal. 4th 800, 821 (1998).  For example, the prosecutor

United States District Court

For the Northern District of California

1    called defense counsel "unprofessional" and "contemptuous," and accused defense counsel of

2    "unabashedly defam[ing]" the witness.  *Id.* at 833-34.  The prosecutor also intimidated a defense

3    witness, threatening him with a perjury prosecution.  *Id.* at 834.  The prosecutor also audibly

4    laughed during defense counsel's examination of witnesses, got out of her chair during defense

5    counsel's examination, stood in his line of sight, stared at defense counsel, and made faces at

6    defense counsel.  *Id.*  The California Supreme Court found that these acts were petty and childish,

7    and threatened the ability of the defendant to receive a fair trial because it was highly distracting and

8    prejudicial.  *Id.*

9           Similarly, in *Boyle v. Milton*, the Sixth Circuit found prosecutorial misconduct.  201 F.3d

10   711 (6th Cir. 2000).  There, the prosecutor constantly called the defendant a liar, badgered and

11   interrupted the defendant, threw a deposition onto the defendant's lap.  *Id.* at 713.  When the court

12   chastised the prosecutor, the prosecutor responded by apologizing to the defendant and stating that

13   he was "just . . . frustrated that you were lying and I'm going to prove it."  *Id.* at 713.  The

14   prosecutor later drew an additional reprimand when he suggested that the defendant needed a

15   psychiatrist.  *Id.* at 714.  The prosecutor later insinuated during closing argument that the defendant

16   was a rich and powerful man who had manipulated the judicial system for his own gain.  *Id.* at 718.

17          The California Court of Appeal considered 20 of the 32[9] improper questions identified by

18   Petitioner, to which the Court will apply § 2254(d) deference.  The Court reviews the remaining

19   questions *de novo*.  As to the questions reviewed by the California Court of Appeal, the Court agrees

20   that while the phrasing of some of the individual questions could be "criticized," the questions as a

21   whole did not constitute misconduct.  *See Smith*, 2004 Cal. App. Unpub. LEXIS 10325, at *37.

22   Instead, the California Court of Appeal found that the prosecutor "was faced with the difficult task

23   of challenging the testimony of the sole witness to the shooting," and that she chose to face this task

24   with "well-placed skepticism."  *Id.*  The California Court of Appeal found that many of Petitioner's

25   objections were complaints about the prosecutor not accepting Petitioner's testimony at face value,

26   —————————————————

27        [9]  Petitioner contends that the California Court of Appeal only considered 24 of the 45
     questions at issue in this subclaim.  In reviewing the petition, the Court finds that Petitioner
28   challenges only 32 questions, 12 of which were not discussed by the Court of Appeal.  *Compare*
     Petition at 17-21 *with Smith*, 2004 Cal. App. Unpub. LEXIS 10325, at *32-39.

United States District Court

For the Northern District of California

as the prosecutor was constantly emphasizing inconsistencies and improbabilities. *Id.* While the questions were tough, the California Court of Appeal found that the questions were generally fair and consistently grounded in the testimony of other witnesses, the physical evidence, and contradictions and improbabilities in Petitioner's testimony. *Id.* at *38.

The Court agrees with the California Court of Appeal's findings, and further concludes that the remaining questions not reviewed by the state court were, if at times forcefully phrased, based on fair characterizations of witnesses testimony and evidence before the jury, rather than suggesting the existence of facts not before the jury. The questions were all relevant to the case, challenging the credibility of Petitioner's self-defense argument by emphasizing contradictions and contrary evidence. Furthermore, the challenged behavior contrasts dramatically with the behavior that the *Hill* and *Boyle* cases found problematic. For example, in *Hill*, the prosecutor not only made sarcastic comments, but made outright falsehoods and deliberately attempted to distract the jury by laughing and making faces during defense counsel's examination of witnesses. 17 Cal. 4th at 833-34. Likewise, in *Boyle*, the prosecutor called the defendant a liar, threw a deposition into the defendant's laps, and suggested that the defendant needed a psychiatrist. 201 F.3d at 713-14. Compared to these cases, where the prosecutor's behavior was especially egregious, the prosecutor's questions here had a basis in the evidence before the jury. The prosecutor in this case may have been capable of more politely phrasing her questions, but her question does not reach the level of misbehavior and badgering that constituted misconduct in *Hill* and *Boyle*. Accordingly, the Court finds that the challenged questions did not constitute prosecutorial misconduct, and Petitioner was not deprived of a fair trial by the prosecutor's questions.

g.    Referring to the Killing as a "Murder"

Petitioner argues that the prosecutor conducted misconduct when she used the term "murder" to refer to the unadjudicated killing. Petition at 21; Traverse at 48. Under California law, it is improper for a prosecutor to use the term "murder" for an unadjudicated killing. *E.g.*, *People v. Price*, 1 Cal. 4th 324, 479-80 (1991) ("it would be improper for a prosecutor to use the term 'murder' in questioning a witness about an unadjudicated killing"). However, Petitioner cites no cases in which the state court found prejudice from referring to an unadjudicated killing as a murder,

1    and the Court can find no such case. *Cf.*, *People v. Garbutt*, 197 Cal. 200, 208-09 (1925) (no

2    prejudice from prosecutor's use of the term 'murder' where the court's admonitory instructions);

3    *People v. Rios*, H034085, 2010 Cal. App. Unpub. LEXIS 7042, at *46 (Sept. 2, 2010) (prosecutor's

4    repeated references to the killing as a "murder" was not prejudicial because "the record does not

5    suggest that these references improperly conditioned the jury to reject appellant's claim of self-

6    defense because he was really guilty of murder"); *People v. McCoy*, C024654, 2002 Cal. App.

7    Unpub. LEXIS 829, at *35-40 (2002) (prosecutor's repeated references to the unadjudicated killing

8    as a murder were not prejudicial because record suggested that the jury was not conditioned to

9    assume the killing was a murder, and that the jury still considered the defendant's self-defense

10    argument).

11        The Court defers to the state court findings, as the California Court of Appeal reviewed this

12    subclaim in its entirety.  The California Court of Appeal found that the trial court improperly

13    permitted a crime technician diagram with the designation "Murder 187 PC" to be shown to the jury,

14    and the prosecutor referred to the "murder" of Tom during direct examination of an expert, redirect

15    examination of a detective, and cross-examination of the defendant. *Smith*, 2004 Cal. App. Unpub.

16    LEXIS 10325, at *40.  While the California Court of Appeal found that the trial court should have

17    redacted the term "murder" from the prosecutor's exhibit and instructed the prosecutor not to use the

18    term, the state court also found that the prosecutor's use of the term did not warrant reversal. *Id.* at

19    *41.  Instead, the California Court of Appeal found that over the course of a nearly three-week trial,

20    the term had only been used on three unique conditions. *Id.*  Furthermore, because the only

21    substantial issue at trial was whether Petitioner killed Tom out of anger or in self-defense, "there is

22    no possibility that the jury's decision – which required four days of deliberations – was influenced

23    by the prosecutor's scattered references." *Id.*  Thus, there was no prejudice.

24        Petitioner argues that the prosecutor used the term on six occasions in questioning four

25    witnesses, three of whom were law enforcement witnesses.  Traverse at 48-49.  The term "murder"

26    was also used on two police exhibits, both of which were given to the jury to review during

27    deliberations.  Traverse at 48.  Petitioner argues that by connecting the term "murder" to law

28

United States District Court

For the Northern District of California

1   enforcement witnesses and exhibits, it indicated to the jury that law enforcement believed that the

2   killing was unlawful.

3        The Court finds that the California Court of Appeal's decision rejecting this claim was not

4   unreasonable or based on an unreasonable application of the facts, as there is no indication that the

5   scattered references to the term "murder" significantly influenced the jury's decision.  It should be

6   noted that the jury took four days to deliberate, even though there was only one substantial issue at

7   trial, *i.e.*, whether Petitioner killed Tom in anger or in self-defense.  Further, as discussed above,

8   there was significant and substantial evidence supporting the jury verdict.  Accordingly, the Court

9   finds that while the prosecutor committed misconduct by referring to the unadjudicated killing as a

10  murder, the misconduct was nor prejudicial.

11       2.    Closing Argument

12       Petitioner argues that the prosecutor committed multiple instances of misconduct during her

13  closing argument by attacking defense counsel's integrity, making an improper appeal to the jury's

14  prejudice and sympathy, and misstating the law and facts.  Petition at 21; Traverse at 50.  The

15  California Court of Appeal did not reveal any of these claims, applying the contemporaneous

16  objection rule to bar review.  *Smith*, 2004 Cal. App. Unpub. LEXIS 10325, at *41-42.  Accordingly,

17  the Court reviews these claims *de novo*.

18       a.    Attacks on Defense Counsel's Integrity

19       A prosecutor may not gratuitously attack defense counsel's integrity and veracity.  *Bruno v.*

20  *Rushen*, 721 F.2d 1193, 1195 (9th Cir. 1983).  A prosecutor may also not attack a defense counsel's

21  legitimate trial tactics.  *United States v. Frederick*, 78 F.3d 1370, 1379-80 (9th Cir. 1996).

22  However, "[c]riticism of defense and theories is a proper subject of closing argument."  *United*

23  *States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997).  Further, to find constitutional error, the

24  comments must be prejudicial to the point of denying the defendant a fair trial.  For example, in

25  *Bruno*, the prosecutor suggested that defense counsel assisted in witness tampering, labeling defense

26  counsel's actions as unethical and illegal with no evidence to support these accusations.  721 F.2d at

27  1194.  The prosecutor also referred to the mere act of hiring defense counsel as probative of guilt,

28  insinuating that "*all* defense counsel in criminal cases are retained solely to lie and distort the facts

35

**United States District Court**

For the Northern District of California

1    and camouflage the truth in an abominable attempt to confuse the jury as to their client's

2    involvement with the alleged crimes," again with no evidence supporting such a claim.  *Id.*  The

3    Ninth Circuit found that this error was not harmless because it was "an impermissible strike at the

4    very fundamental due process protections that the Fourteenth Amendment has made applicable to

5    ensure an inherent fairness in our adversarial system of criminal justice," as attacking the right of a

6    defendant to retain counsel damaged the defendant's opportunity to present his case.  *Id.* at 1195.

7    The Ninth Circuit concluded that the comments were calculated to wrongful impute guilt to the

8    defendant, and were sufficient to grant habeas relief.  *Id.* at 1195.

9         In *United States v. Friedman*, the Second Circuit likewise reversed a conviction due to

10   prosecutorial misconduct.  909 F.2d 705 (2d Cir. 1990).  The prosecutor told the jury that "While

11   some people . . . go out and investigate drug dealers and prosecute drug dealers and try to see them

12   brought to justice, there are others who defend them, try to get them off, perhaps even for high fees."

13   *Id.* at 709.  The Second Circuit found that with this one comment:

14            the prosecutor managed in one breath to undermine the presumption of
             innocence, the Government's obligation to prove guilt beyond a
15            reasonable doubt, and the standards of propriety applicable to public
             prosecutors.  The jury was invited to conclude that everyone the
16            Government accuses is guilty, that justice is done only when a
             conviction is obtained, and that defense counsel are impairing this
17            version of justice by having the temerity to provide a defense and to
             try to "get" the guilty "off."
18

19   *Id.*  In addition to this comment, the prosecutor repeatedly characterized defense counsel as a

20   "witness" and his opening statement as "unsworn testimony," thus urging the jury to ignore defense

21   counsel's role as an advocate.  *Id.*  The prosecutor also accused the defense counsel of making "any

22   argument he can to get that guy off."  *Id.*  The court found that while the prosecutor was entitled to

23   answer defense counsel's summation using the evidence, the prosecutor was not entitled "to malign

24   defense counsel by accusing him of willingness to make unfounded arguments that were not made."

25   *Id.*  The Second Circuit concluded that these comments were prejudicial because they risked

26   distorting the jury's understanding of the roles of prosecutors and defense counsel, and no curative

27   instructions by the trial judge were made when defense counsel objected.  *Id.* at 709-10.

28

United States District Court

For the Northern District of California

1    In contrast, in *Williams v. Borg*, the Ninth Circuit found that the prosecutor's attack on

2    defense counsel was error but not prejudicial.  139 F.3d 737 (9th Cir. 1998).  There, the defendant

3    had taken the stand but refused to answer any questions on cross-examination, resulting in the

4    defendant's testimony being stricken.  *Id.* at 739.  During the closing argument, the prosecutor

5    argued that the defendant's acts were part of the defense counsel's scheme to let the jury hear the

6    defendant's story, which would then be stricken when the defendant refused to answer questions on

7    cross.  *Id.* at 745.  The Ninth Circuit found there was no evidence that the defense counsel intended

8    for this to happen, and the prosecutor's insinuation was unprofessional.  *Id.*  However, the Ninth

9    Circuit concluded that because there was strong evidence of the crime, the comments did not infect

10   the trial with unfairness as to require that the verdict be set aside.

11       In the instant case, the prosecutor started off her closing argument by saying that she was not

12   going to "correct all of the misstatements [defense counsel] made, his selective memory regarding

13   the evidence, his inaccurate recounting of what individual witnesses said."  16 RT 2527.  The

14   prosecutor also said that defense counsel misstated evidence, and intentionally lied when he read

15   from a report that he pretended was Officer Jim's report, when it was not.  16 RT 2529-30.  The

16   prosecutor then said that by using such misrepresentations, the defense counsel was showing "the

17   desperate levels that the defense has sunk to, that they need to lie to you, because they're not under

18   oath.  They need to lie to you about what the evidence was."  16 RT 2530.  The prosecutor also

19   made multiple references to the defense attorneys "doing the best they could to avoid the truth," and

20   argued that "when the defense attorney gets up here and starts yelling and starts shouting trying to

21   cover up those undisputed facts, those undeniable facts, you know what's really happening, and you

22   know what the defendant is really guilty of.  That's first degree murder."  16 RT 2533, 2591.  These

23   statements emphasized the lack of evidence on the part of the defense, and pointed out where

24   defense counsel may himself have misled the jury when he pretended to read from Officer Jim's

25   report when he was not in fact doing so.  *Compare with Casey v. Virga*, Case No. CV 10-4672-

26   AG(JPR), 2011 U.S. Dist. LEXIS 152648, at *36-37 (C.D. Cal. Nov. 28, 2011) (finding no

27   misconduct where "the prosecutor's statements that defense counsel 'distorted the truth, in an effort

28   to try to confuse you jurors' and 'they just slowly mask over that important fact, and they move on

1  with misrepresentation about the evidence' related to the evidence presented by defense counsel and

2  the prosecution's disagreement with the defense's characterization of the evidence."). However, in

3  accusing defense counsel of having to lie to the jury because defense counsel was not under oath, the

4  prosecutor erred by directly attacking defense counsel's integrity. While this statement likely

5  constitutes misconduct, as discussed above and below, the statement was not prejudicial because of

6  the strong evidence supporting the jury's verdict. *Williams v. Borg*, 139 F.3d at 745.

7      Petitioner also contends that the prosecutor committed misconduct when she told the jurors

8  that if defense counsel "so much as mentions those voluntary manslaughter instructions or those

9  involuntary manslaughter instructions," he was acknowledging that Petitioner's self-defense story

10  "was baloney. It was a fabrication, it was untrue. It was ridiculous." 16 RT 2591. As discussed

11  above, criticism of defense theories and tactics is a proper subject of closing arguments. *Sayetsitty*,

12  107 F.3d at 1409. The prosecutor did not commit error in showing a contradiction in the positions

13  argued, as Petitioner had argued strenuously that he was acting in self-defense because he believed

14  Tom was going to attack him. Further, defense counsel did not in fact ask the jury to consider

15  voluntary manslaughter if Petitioner had acted in imperfect self defense, instead focusing entirely on

16  a self-defense claim. 16 RT 2513. Thus, ultimately there was no direct attack on defense counsel's

17  integrity.

18      Finally, Petitioner challenges the prosecutor's references to defense counsel as "a team of

19  fancy lawyers, jury consultants, aids wheeling things back and forth for me and my use," comparing

20  defense counsel to the prosecutor as a "government employee that I am, getting my paycheck every

21  two weeks. Unlike the defense attorneys whose job is to do whatever they can, at all costs, to get

22  their clients off." 17 RT 2750. Unlike *Bruno*, the statement does not suggest that simply hiring a

23  lawyer implied guilt, or attacked Petitioner's right to have an attorney. *See* 721 F.2d at 1194.

24  However, the statement is comparable to that in *Friedman*, where the Second Circuit found that a

25  statement about defense counsel trying to get off criminals was misconduct. *See* 909 F.2d at 709.

26  While this statement would have constituted misconduct, the trial court sustained an objection to this

27  statement. Thus, absent a strong likelihood that the jury would be unable to disregard the statement

28  and a strong likelihood that the effect of the misconduct would be devastating to the defendant, there

was no error.  *Greer v. Miller*, 483 U.S. at 766 n.8; *see also United States v. Baker*, 10 F.3d 1374, 1416 (9th Cir. 1993) (finding no misconduct where prosecutor's improper comments were neutralized by a sustained objection).

Even where the prosecutor's statements were improper, Petitioner is still not entitled to habeas relief because there was no prejudicial effect of the statements.  The jury was instructed that counsel's statements were not evidence.  *E.g.*, 16 RT 2553.  Further, as discussed above, there was significant evidence supporting the jury's verdict.  Thus, any misconduct here was not prejudicial. *See Williams*, 139 F.3d at 745 (no prejudicial error because there was strong evidence of the crime); *Casey*, 2011 U.S. Dist. LEXIS 152648, at *37-38 (no prejudicial error where jury was instructed that counsel's statements were not evidence and there was strong evidence of the crime).

> b.   Improper Appeal to Jury's Prejudice and Sympathy

Petitioner contends that the prosecutor committed misconduct by improperly appealing to the jury's sympathy.  In *Drayden v. White*, the Ninth Circuit found misconduct where a prosecutor sat in the witness chair and delivered a long soliloquy of what the victim would have said if he could have testified in the case.  232 F.3d 704, 711-12 (9th Cir. 2000).  In delivering the soliloquy, the prosecutor "inappropriately obscured the fact that his role is to vindicate the public's interest in punishing crime, not to exact revenge on behalf of an individual victim."  *Id.* at 712-13.  The Ninth Circuit also found that the prosecutor risked manipulating and misstating the evidence by creating a fictitious character based on the victim and testifying in the character's voice as if he was a percipient witness.  *Id.* at 713.  Finally, the Ninth Circuit found that the soliloquy risked improperly inflaming the passions of the jury by making a first-person appeal to the sympathies of the jury for the victim, who according to the character "was a gentle man who did nothing to deserve his dismal fate."  *Id.*  However, although the Ninth Circuit found that the soliloquy constituted misconduct, it concluded that the misconduct was not prejudicial because the soliloquy was supported by the evidence.  *Id.*  The trial court had also warned the jury that it must not be influenced by sympathy or passion, and the Ninth Circuit presumed that the jury followed such instructions.  *Id.*  Finally, the court found that there was strong support for the jury's verdict such that the soliloquy did not render the trial fundamentally unfair.  *Id.* at 713-14.

United States District Court

For the Northern District of California

1   Likewise, in *Fields v. Woodford*, the prosecutor asked the jury "to think of yourself as [the

2   victim]" and described the crimes committed against her from her perspective.  309 F.3d 1095, 1109

3   (9th Cir. 2002).  Although the Ninth Circuit found error, it concluded that the prosecutor's remarks

4   did not infect the trial with unfairness because the statements were supported by evidence and the

5   court had instructed the jury that statements made by the attorneys were not evidence.  *Id.*

6   Furthermore, there was strong evidence supporting the verdict, and thus the prosecutor's emotional

7   appeal was unlikely to affect the verdict.  *Id.*

8   In the instant case, the prosecutor asked how much Petitioner had thought "before he pulled

9   the plug on Russell Tom's life, before he chose to fire his gun six times, before the defendant shot

10  Russell Tom in the back?"  16 RT 2526.  The prosecutor later compared Petitioner's life over the

11  last three years with Tom's death, arguing:

12            And as for that horrible life that the defendant's been leading over the
              last three years, the horrible life where the defendant has been out of
13            custody, walking around, eating, drinking, going to restaurants, seeing
              movies, taking vacations, spending time with his girlfriend, boy that
14            really must be a horrible life.  What about Mr. Tom?  Is any of that as
              horrible as being shot in the back, feeling the searing pain and not
15            knowing what it is or what you did to deserve it?  Is that as horrible as
              turning around, looking up and staring down the face of the barrel of a
16            .45 caliber combat commander?  Is that as horrible as being shot again
              in the arm, again in the chest, feeling the bullet tear through your
17            body, through and through?  Is that as horrible as running for your life,
              stumbling, falling, trying to get away, and realizing deep down you
18            don't think you can?  Is that as horrible as crawling, struggling,
              turning, trying to get out of this unexplainable circumstance, and
19            instead be shot one last time in the heart?  Gasping for breach as the
              life leaves you?

20

21  17 RT 2749.  The Court finds that this statement is misconduct, comparable to the statement in

22  *Fields* by asking the jury to put itself in the place of Tom as he was shot and killed.

23  Although this statement was misconduct, it was not prejudicial.  As in *Fields* and *Drayden*,

24  the trial court here instructed the jury not to be influenced by sympathy, passion, prejudice, or public

25  feeling, and informed the jury that statements made by the attorneys during the trial were not

26  evidence.  17 RT 2759, 2760.  There was also substantial evidence supporting the jury's verdict, as

27  discussed above.  Furthermore, the prosecutor's statement was made in response to defense

28  counsel's own improper comments during his closing arguments, in which defense counsel

40

United States District Court
For the Northern District of California

1  compared the jury's decision to making a medical decision to "pull the plug" on someone's life

2  support system.  16 RT 2522.  The defense counsel then stated that Petitioner was:

> somebody else's father.  He's somebody else's friend.  He's somebody
> else's boyfriend.  But he's not yours.  But you have to protect his
> rights as if you were.  Believe me, from the point of view of
> [Petitioner] and all the people who know him and love him, you're
> making a decision about whether or not to disconnect his life support
> system.  And the law requires that you not let this happen, unless you
> be given proof beyond a reasonable doubt.

7  16 RT 2523.

8       After the jury was dismissed for the day, the trial court expressed its concern with defense

9  counsel's comparison of the jury's decision with a decision to disconnect a life support system.  16

10 RT 2548.  The following day, the court again expressed its concern that the comments raised the

11 improper subject of penalty and punishment that the parties had already been told not to discuss.  17

12 RT 2732 ("A decision about whether or not to disconnect [Petitioner's] life support system is an

13 extraordinarily thinly veiled reference to penalty or punishment.").  The prosecutor's argument here

14 had the effect of righting the scale unbalanced by defense counsel's use of improper tactics.  *E.g.*,

15 *United States v. Young*, 470 U.S. 1, 12 (1985) ("Indeed most Court of Appeals . . . have refused to

16 reverse convictions where prosecutors have responded reasonably in closing argument to defendant

17 counsel's attacks, thus rendering it unlikely that the jury was led astray.").

18      Accordingly, the Court finds that while this portion of the prosecutor's closing argument was

19 likely misconduct, it was not prejudicial because it was a direct response to defense counsel's own

20 improper comments and was tempered by the jury instructions.  Furthermore, there was strong

21 evidence supporting the jury's verdict, and the improper statement did not render the trial

22 fundamentally unfair.

23              c.   Misstatement of Law

24      Petitioner argues that the prosecutor misstated the law by telling the jury that Petitioner did

25 not have to react with deadly force because he could have called for help or retreated instead of

26 firing a weapon to defend himself.  *See* 16 RT 2580-81.  Under California law, "[a] person who

27 without fault on his part is exposed to a sudden felonious attack need not retreat.  In the exercise of

28 his right of self-defense he may stand his ground and defend himself by the use of all force and

**United States District Court**
For the Northern District of California

1   means apparently necessary . . . ." *People v. Collins*, 189 Cal. App. 2d 575, 588 (1961).  "This rule

2   applies even though the assailed person might more easily have gained safety by flight or by

3   withdrawing from the scene." *Id.*

4         The Court finds that the prosecutor's statement does not constitute misconduct.  In general, a

5   prosecutor's arguments on the law "generally carry less weight with a jury than do instructions from

6   the court." *Boyde v. California*, 494 U.S. 370, 384 (1990).  Such statements are viewed as

7   arguments, not evidence, and are therefore "likely viewed as the statements of advocates; [jury

8   instructions, in contrast,] are viewed as definitive and binding statements of the law." *Id.*  Thus, an

9   error during arguments does not have the same force as an instruction from the court, and the

10  arguments of counsel must be judged in the context in which they are made. *Id.* at 385.

11        Here, the prosecutor was not arguing that Petitioner had a duty to retreat if he was being

12  attacked, but that the only "danger" Petitioner risked was losing the opportunity to kill Tom.  16 RT

13  2580.  Even if this statement had the potential to confuse jurors into thinking there was a duty to

14  retreat, the trial court issued jury instructions that stated that "[a] person threatened with an attack

15  that justifies the exercise of right of self-defense need not retreat," and explained the right of a

16  person to stand his ground and defend himself through force.  17 RT 2775-76.  The jury was also

17  repeatedly informed that where an attorney's argument conflicted with the court's instruction on the

18  law, the jury was required to follow the jury instructions.  16 RT 2554; 17 RT 2579.  Accordingly,

19  the Court finds that the prosecutor did not commit prejudicial misconduct in stating that Petitioner

20  did not have to react with deadly force.

21           d.     <u>Misstatement of Facts</u>

22        Finally, Petitioner argues that the prosecutor misstated facts and referred to facts not in

23  evidence during her closing arguments.  Petition at 25-26; Traverse at 54-56.  A prosecutor commits

24  misconduct during closing argument when the prosecutor manipulates or misstates the evidence

25  presented at trial.  *Darden*, 477 U.S. at 181-82.  However, a prosecutor may argue reasonable

26  inferences based on the evidence.  *Id.*  In determining whether a prosecutor's statements are

27  prejudicial, courts have considered whether the trial court instructed the jurors that the arguments of

28

United States District Court

For the Northern District of California

1    counsel are not evidence, and that the jury's decision should be based on the evidence alone. *Id.* at

2    182.

3         First, Petitioner challenges the prosecutor's argument that Dr. Van Meter's testimony

4    showed that Tom did not "have the ability to come breaking out windows, lunging out of his car and

5    running down the street. He didn't have those quick reflexes that the defendant's claiming." 17 RT

6    2746. Dr. Van Meter did not in fact testify as to Tom's ability to do such actions, but only discussed

7    the effects of alcohol on a person's actions, such as a person's ability to drive. *See* 6 RT 1153-55.

8    However, in looking at the full context of the prosecutor's statement, the prosecutor did not imply

9    that Dr. Van Meter in fact testified as to Tom's ability to break windows. The prosecutor clearly

10   stated that she had asked Dr. Van Meter about the effect on alcohol on driving, and then applied that

11   explanation to Tom's likely ability to commit the acts that Petitioner claimed he did. 17 RT 2746.

12   Thus, the prosecutor did not represent that Dr. Van Meter testified about Tom's ability, but made a

13   reasonable inference based on the testimony.

14        Second, Petitioner argues that the prosecutor incorrectly told the jury that the prosecutor had

15   presented evidence of Tom's blood alcohol level. Petition at 25-26; *see* 17 RT 2745-46. Although

16   the prosecutor qualified Dr. Van Meter to testify as to the effects of alcohol on the human body, the

17   prosecutor did not discuss Tom's drinking with Dr. Van meter during direct examination. Instead,

18   trial counsel first elicited the information about Tom's blood alcohol level on cross-examination,

19   and the prosecutor followed up on this examination during re-direct. 6 RT 1139. However, in her

20   closing argument, the prosecutor stated that she qualified Dr. Van Meter to testify as to the effects of

21   alcoholism, and that she put evidence of the blood alcohol level before the jury, including a report

22   from the Institute of Forensic Sciences. 17 RT 2745-46. While the prosecutor may not have been

23   the first to introduce the evidence of Tom's drinking, she did present evidence on the issue. As

24   such, she did not misstate the facts. Even if there was a misstatement, the issue was so collateral

25   that it was not prejudicial.

26        Third, Petitioner argues that the prosecutor misstated the facts when she described the initial

27   fist fight between Petitioner and Tom, claiming that Petitioner first swung at Tom and missed. 17

28   RT 2752. Although Petitioner argues there was no evidence that Petitioner started the fight, McNew

1    had testified that Petitioner was the one who picked a fight and punched Tom, and Tom had small

2    injuries on his lip when he returned to the bar after the fight.  1 RT 173; 2 RT 339.  McNew's

3    testimony forms a foundation for the prosecutor's statement that Petitioner instigated the fight, and

4    thus the prosecutor did not misstate the evidence.

5         Fourth, Petitioner argues that the prosecutor argued that Petitioner destroyed or hid his

6    clothing because he knew the clothing could disprove his claim of self-defense, thus showing

7    consciousness of guilt.  16 RT 2540.  Petitioner claims that there was no evidence that the clothes

8    were probative; however, the prosecutor had a good faith basis to believe that the clothes were

9    probative if it failed to contain glass or gunshot residue that would have contradicted Petitioner's

10   version of events.  Thus, the prosecutor could fairly argue that Petitioner's failure to turn over the

11   clothes was inculpatory.  The prosecutor did not misstate the facts by arguing that Petitioner's

12   failure to produce the clothes was evidence of guilt.

13        Finally, Petitioner argues that the prosecutor misstated the facts when the prosecutor argued

14   that the original fight occurred because Tom could no longer stand Petitioner's racist comments.  16

15   RT 2569.  Petitioner argues that there is no evidence that the altercation occurred as a result of the

16   racial comments or that Tom was offended by being called "Navajo."  However, the prosecutor had

17   introduced evidence that Tom was proud of his Native American heritage and that others believed

18   that the term "Navajo" was insulting, and McNew testified that Petitioner instigated the fight by

19   making insulting comments to Tom.  2 RT 339-40, 361.  The prosecutor's argument was based on

20   evidence and offered an alternative explanation for the cause of the fight, contradicting Petitioner's

21   claim that the fight was caused by Tom's need for money.  The prosecutor had a good faith basis for

22   inferring from the witness testimony that the argument was caused by Petitioner's use of the term

23   "Navajo," and thus did not commit misconduct.

24        As discussed above, the statements challenged by Petitioner are not misstatements of the

25   evidence presented at trial.  Instead, the prosecutor's statements were either based on trial evidence

26   or reasonable inferences therefrom.  Even if these comments were misstatements of fact, the

27   prejudicial effect is limited.  The statements were made during closing argument, and the trial court

28   instructed the jury before the closing arguments and in the jury instructions that statements made by

United States District Court
For the Northern District of California

the attorneys during the trial are not evidence.  16 RT 2553-54; 17 RT 2796.  Thus, any prejudicial effect would be diminished by the jury instructions.

        3.    <u>Cumulative Impact</u>

      The Court finds that even when considered as a whole, the prosecutor's actions in this case do not amount to prejudicial misconduct.  Most of the prosecutor's statements were justified by the evidence and law, and did not constitute misconduct.  Even if some of the statements constituted misconduct, Petitioner has not shown that these statements rendered the trial fundamentally unfair.  As discussed above, there was significant evidence supporting the jury's verdict, there was evidence that Petitioner had threatened to kill Tom, and that upon his return to Baggy's hid from view after McNew told him to leave.  During the shooting, Petitioner shot at Tom six times including one shot in the back, and was found standing over Tom with a gun pointed at Tom's head.  The prosecutor introduced evidence of a blood trial, indicating that Tom had attempted to escape after being shot at least once.  Petitioner left the scene of the crime, and when he was brought in for questioning by the police, Petitioner focused on the initial fight rather than saying that Tom had tried to attack him right before the shooting.  The prosecutor also undermined Petitioner's self-defense argument, providing evidence that Tom was not in desperate need of money, that Tom could not have broken the window, and the unlikeliness that Petitioner could have thought Tom was trying to pull out a weapon.  Petitioner's own testimony was also inconsistent, such as his firing a warning shot in the air before stating that he fired the warning shot directly behind him.  Taken together, the evidence demonstrates that Petitioner's self-defense claim was not credible, and that Petitioner had shot Tom without justification.  Accordingly, the Court denies Petitioner's prosecutorial misconduct claims.

D.    <u>Certificate of Appealability</u>

      The federal rules governing habeas cases brought by state prisoners require a district court that enters a final order adverse to a petitioner to grant or deny a certificate of appealability ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

      A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a COA.  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

United States District Court

For the Northern District of California

2253(c)(2).  The certificate must indicate which issues satisfy this standard.  28 U.S.C. § 2253(c)(3).

"Where a district court has rejected the constitutional claims on the merits, the showing required to

satisfy § 2253(c) is straightforward: The Petitioner must demonstrate that reasonable jurists would

find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

*McDaniel*, 529 U.S. 473, 484 (2000).

This was not a close case.  For the reasons set out above, jurists of reason would not find the

result debatable or wrong.  A COA will be denied.  Petitioner is advised that he may not appeal the

denial, but he may ask the court of appeals to issue a COA under Rule 22 of the Federal Rules of

Appellate Procedure.  *See* Rule 11(a), Rules Governing § 2254 Cases.

### III.   CONCLUSION

For the reasons stated above, the petition for writ of habeas corpus is **DENIED** on the merits.

A certificate of appealability is **DENIED**.

This order disposes of Docket No. 1.

The Clerk of the Court is directed to close the file in this case.

IT IS SO ORDERED.

Dated:  May 10, 2012

_____
EDWARD M. CHEN
United States District Judge